We have one case on the docket this morning. It's Balentine v. Davis. May it please the Court. My name is Stuart Lev. I represent Mr. Balentine and I thank the Court for taking the time to hear from us today. If I might just say at the outset to let the Court know, I have somewhat of a visual disability that might make it hard for me to read the numbers on the time. So if I go over the time or I miss something on the time, I apologize for that in advance. The case is here today on our application for a CLA from the denial of the Rule 60 motion by the lower court. The essence of the argument today deals with our claim that trial counsel was ineffective in their investigation and representation of Mr. Balentine at the penalty phase of the trial. This is a case where the defense went off the track from the very beginning of their representation. Two lawyers were appointed to represent Mr. Balentine shortly after his arrest and for the next seven months they did nothing to prepare this case for the punishment phase. They did hire an investigator, but that investigator did no work. That's bad enough. But counsel, supposed to be supervising the work of the investigation, never did anything to make sure the investigator was doing work. For so seven months, nothing happened. Counsel filed the motion. Counsel got enough information from Mr. Balentine to realize that there may be mental health issues involved in the case. But you're not contending that now? I'm sorry? You're not contending now that he's mentally incompetent to be executed or mentally incompetent to hear about mitigation? I'm talking about mitigation, yes. Let me ask you one question that I know is not in the vein that you're talking to us about. Has Mr. Balentine ever testified either under oath or in an affidavit that he, that counsel, and he did not have any exchange that counsel says he did, that he did not tell counsel that he would prefer a death sentence to a life sentence because he did not want to be attacked with a shove by inmates? No, he has not testified to that or filed it. He's not contesting that that was told to him? He's not denying it and he's not denying that he told counsel not to present the penalty phase witnesses, the punishment phase witnesses that counsel hadn't done. Does he deny that at the point in time that he did say I would rather have a death sentence than a life sentence because I'm afraid of being attacked in general? I think at that point in time and you have to look at the context. You concede he did, he was told that or he did say that? I concede he did say he'd rather have a death sentence within the context of talking about the life offer that had been made to him. So Mr. Valentine was made an offer at the close of the state's case for a life sentence and defense lawyers went to him and said, I said, John, you have to take this. If you don't take this and the jury convicts you, you'll get death. And John said, I want to go to the jury. I will risk death. I will prefer death, but I want to take a chance with the jury. And that was reasonable at that time. And it was reasonable for a couple of reasons. First of all, Mr. Sherrod, the defense lawyer testified that as they were going to talk to Mr. Valentine, he told Mr. Durham, the other lawyer, he's not going to take it because you've given him false hope about what the outcome of emphasized that hope. It comes at the end of the prosecution's case after there had been a juror view of the scene where there was a demonstration of the gunshots. And I understand how that would make that factor in so heavily because I thought the evidence was that all three minors were shot in the head, just as he had described in his confession. So it doesn't look like they woke up in any of the three. And the only other person in the house was Chris. And we don't know if Chris had been taking drugs or not, but how did the loudness of the gunshots? Because it raises doubt about the accuracy and reliability of Chris's testimony that he slept through that. Well, even Chris didn't sleep through it and he was pretending to be asleep, hoping that his life would be spared. What does that have to do with guilt or innocence of Mr. Ballantyne? Well, it has to do maybe with the accuracy and the reliability of Mr. Ballantyne's confession that was challenged by the defense throughout the trial, trying to raise reasonable doubt to the jury. That he was the shooter? That whether he was not a shooter. I don't want to connect that, but go ahead, I don't want to interrupt. And that was in the closing argument. But it's reasonable to think, and Mr. Sherrod said this in his testimony, that the only reason for the state to offer the life sentence at the close of their case was because they must have had some concern about what the outcome of that case before the jury might be. They were there in the courtroom, saw the jury's reactions to what happened. And then suddenly, after seeking death the entire time, at the end of the case, make the life offer. And so if Mr. Sherrod understands that the state might be concerned about it, it's easy to see how Mr. Ballantyne could be thinking, well, if the state has some doubt, I want to take my chances with the jury verdict. And even if that means that I'm going to get death at the time of the penalty phase verdict, because that's what my lawyer's telling me. My lawyer's telling me, if the jury convicts you, it doesn't matter whether we put these witnesses on or not. These witnesses aren't going to help you, you're going to get death. And Mr. Ballantyne says, I want to take my shot at the jury. And he's entitled to do that, and he's entitled to do that without penalty. And so you can't separate, I don't from the situation. What is the evidence exactly, after the jury found him guilty, and before you move into the penalty phase, what exactly was discussed between Mr. Ballantyne and his counsel about putting on a litigation case? Because I read the transcript, and it's not crystal clear to me. As I read the transcript, and I read the same transcript you did, of course, Your Honor. As I read the transcript, the only discussion was in the courtroom after the states, maybe after the state presented its punishment witnesses, where the lawyers leaned over to Mr. Ballantyne and say, have you changed your mind about calling the witnesses that are available? And Ballantyne says no. That Mr. Sherrod said was the extent of the discussion after the jury had come back with this verdict. But there was a prior discussion, because he says, did you change your mind? So that means that they had to have talked about it already. The prior discussion was at the time of the plea offer. So there were two discussions. It seems like there's probably three discussions, I mean, because the plea offer, and then he asks him, are you going to call, but you don't talk about the witnesses until after you, I mean, he would have had to specifically discuss calling the witnesses at some point before the punishment phase of the trial. And at least as I read the transcript of the evidentiary hearing, that's what Mr. Sherrod testified to. Mr. Sherrod testified to at the time of the discussion about the plea offer, part of his encouragement of Mr. Ballantyne to take the plea was to say the witnesses that we have available are not going to help you. So the witnesses for the punishment phase was part of the discussion about whether or not to take the plea offer. Well, actually, I mean, the court did said that determined that Ballantyne told him not to call witnesses because he did not want a life sentence. That's what the opinion says. Because he did not want a life sentence if that meant giving up his chance for a jury verdict. That's not what this says. It just says he didn't want a life sentence. It's not in conjunction with the decision to plead or not plead. But when you look at the record, that's the context of the discussion that Mr. Ballantyne had with Mr. Sherrod. And so we can't really separate out the punishment. And Mr. Sherrod says that the second discussion was just in the courtroom. And it's remarkable to me that there was a weekend in between the jury verdict and the start of the punishment phase. And there's no evidence. None of the lawyers' billing records show that they went and talked to Mr. Ballantyne even in that weekend between the two phases. Well, something happened in the penalty phase testimony early on Monday and earlier than they had told the judge. And so the judge tells counsel for Mr. Ballantyne to be back here at 1.30. There was an exchange about that. Even at that point, counsel was saying, I've got four, five, six witnesses, but they won't take long. And then the next thing you see in the transcript is the jury's been given the charge. So something transpired in there that counsel, because the counsel told the judge, we're going to call some witnesses. And is it Sherrod or Sherrod anyways? His counsel said that we had a conversation in the courtroom and I asked him, should we put on these witnesses? And he said, don't put on any witnesses. So we know there was discussion after the weekend. It had to have been that Monday. That's right. That's right. And that's clear in the courtroom, don't put on these available witnesses. And these witnesses weren't mitigation witnesses in the way we think of mitigation witnesses. Here's my problem. We don't know from the record, and it seems to me, it's Ballantyne's burden to say, the reason I didn't want you to put on witnesses was because I still didn't want to go in the general population because I was afraid I would be killed or injured with a shiv. I'd rather take my chances in death on death row. Or I had a change of heart, but you're telling me it won't do any good anyway, so let's just not proceed. We don't know one way or the other what was going on in Mr. Ballantyne's mind, why he said don't put on the witnesses. And he has not come forward and said, I changed my mind. I was no longer afraid of being shivved. The reason I said don't put on any witnesses is because you've told me it will be fruitless. So you have that burden, it seems to me, to show prejudice, and I don't see it in the record that that burden's been met. Well, I think our burden of showing prejudice is showing the kinds of evidence that could have been presented if counsel had... But if Mr. Ballantyne's stand in mind at that point in time was, I only want to go to death row, not because it's unaffected by telling me the witnesses won't carry the day. We've got two things in the record that could be the possible cause, and both are plausible, it seems to me. But he's never given the opportunity to make that choice about what kinds of mitigation witnesses he would be willing or not willing to present, because counsel never did that investigation. But there's nothing in the record that he, even years later, said that, no, that's not true. I did not want death at that point. I wanted life, and I wanted them to fight for me, but they had done a poor job, and I knew they were going to lose, so it was just hopeless. There's nothing in the record that says that narrative. Not directly, but I think there's some indirect indications of that, that Mr. Ballantyne at the penalty phase hearing, he told counsel he was unhappy with counsel, that they weren't cross-examining the state witnesses, and counsel put that on the record, that Mr. Ballantyne asked counsel to cross-examine the state witnesses. That's not a sign of somebody looking for death. He was looking for exoneration as opposed to, that was in the guilt phase, right? In the guilt phase, but not in the punishment phase. He's wanting counsel to cross-examine the state witnesses. How about in the guilt phase? In his punishment phase. And then trial counsel gives a closing argument, asking for a life sentence. And so that's not consistent with the defendant, with a lawyer who's representing a defendant who wants death. And Mr. Ballantyne doesn't object or say anything against counsel's closing argument, asking for a life sentence. But has Mr. Ballantyne said anything since then? Has he made these points? He's the one who would make an affidavit, or at the hearing, or somewhere have said this, that what they're saying is not true, and that he never said that. Where did he, why hasn't he come forward and said, there's no evidence that supports your position, is the problem with the case. Why isn't there evidence? I think there is circumstantial evidence. But we could actually have direct evidence from him if he wanted to say that he wanted, at that time, he was all in for life, but he was told, that his lawyers had done a bad job and he was fighting with them. He could have easily put that in some type of affidavit or testify at the hearing. That's not in the record. That's not in the record. I have to agree with that. So counsel, let me just back up for a second and ask, we are procedurally, we are here deciding whether to grant a COA from, to review the denial of a 60 v. 6 motion by the district court. Correct. That's why we're here procedurally. Now, one preliminary question for me is, are we required to find that the district court, or the magistrate judge more specifically, but made a clear error, abused his discretion in making the fact findings that are in the magistrate report. In other words, I hear your discussion about the evidence, I understand where you're coming from, I get it, but we have a magistrate report that's making fact findings after an industry hearing. Is part of our, part of what we have to decide here is whether there was a factual error made about what Mr. Ballantyne told us, what his instructions were? Is that part of the analysis? I don't think so. I think it's a question of context of those fact findings, of putting those fact findings within the context of Mr. Ballantyne's decision whether or not to accept the life offer, as opposed to his decision of whether or not. Let me just, let me just, I guess, explain my question a little more. If I have a fact finding that says Mr. Ballantyne instructed his attorneys not to put on mitigating witnesses because Mr. Ballantyne did not want to serve, you know, until his fifties or sixties in a general population where he could get shivved, said he preferred death because of, you know, the amount of time he spent on death row, and the relative safety of that, so to speak. If I've got a fact finding on that from the magistrate, aren't, aren't I required to at least consider whether there's been an abuse of discretion? Well, a clear error. A clear error, sorry. Yeah. Yes, you have a fact finding there, but when you put that fact finding in the context, and that's what I'm saying, that fact finding is a context of Ballantyne's explanation to counsel about why he's not accepting the life offer. Right, but doesn't that just announce that he's finding clear error? So it's finding clear error. Maybe I find clear error because of this context. Maybe you find clear error because of the context, or maybe you just find that the weight of that finding within the context of the Strickland analysis is not determinative as it is in many of the other waiver cases that you've had before you, that the court has had before you. Well, I guess one, one thing I'm getting at is that we have a decision, sure, that speaks to an ineffective assistance of counsel claim when the defendant has instructed attorneys not to put them in getting evidence. How do you get around that? Well, I think sure is different in a couple of reasons. One is it's a merits decision. Well, no, I'm sorry. It sure is a COA. One is it's a 2254D, and so it's a question of the reasonableness of the state court finding as opposed to just a flat out recognition of the facts of the case or the error. So it's assuring a deferral. Yes, sure. You have it here. Here we go. Right. Because there's no state court. Right. There's, there's maybe deference to the magistrate, but not to the state court under, under 2254D. In short, there's no indication that counsel had limited their investigation of mitigation or that the defendant was doing anything other than waiving all mitigation. And there was a record made at the time of trial. And that's part of the problem here, is that, is that defense counsel, even though he's required to under the ABA guidelines and under the Texas guidelines, and those are just guidelines, not constitutional law, of course. And counsel had put on the record many different disagreements that they had with Mr. Valentine along the way about the venue motion, about cross-examining witnesses, about declining the record. There is nothing on the record here at the time of trial. There's nothing contemporaneous about Mr. Valentine wanting death and wanting to waive. And counsel's actions in preparing for penalty phase over the weekend, despite Mr. Valentine's instructions over the weekend, Mr. Mr. Sherrod had six and a half hours of preparation time. Ms. Garrison, the investigator was serving subpoenas. They were preparing to present a case at penalty phase. They weren't acting as if this were a waiver case. So this case, on its facts and on its procedural position, is just very, very different with Schor. I would also say that Schor, I think, to some extent, lies in tension with this court's decision in Autry. And we argued that in our brief, in Autry, it talked about counsel being bound by knowing decisions, informed decisions that a defendant makes. In this case, Mr. Valentine's decision is informed only by the limits of counsel's investigation. Mr. Valentine's informed only about the witnesses who are available, who are witnesses who would testify about threats made against him prior to the hearing. This panel could choose not to follow Schor under the rule of orderliness? I think under the rule of orderliness, this panel could choose not to follow Schor. It could find Schor distinguishable. There's also tension in this court's case law between Trevino and Schor. In Trevino, there is a footnote that says that panels aren't bound by CLA opinions. There are other cases in this court where you have relied on CLA opinions. So there's certainly some tension and some disagreement among the panels of this court about how much weight should be given. But I think more than that, that the procedural posture of Schor and that the factual basis of Schor is just very different than what we have now. I have a question. But Autry is not about this type of waiver. Wait, Autry has to be on the record, Amal, because it deals with competency, which is a very complicated, and there are all sorts of procedural requirements about competency that are not required in these other phases of the trial. So to say that Autry says that Schor is wrong is quite a stretch, isn't it? I don't say it. I didn't say necessarily that it's wrong, but certainly there's tension there. And that tension is debatable, which should be considered at the COA stage. Why is there tension between competency and specific procedural steps to make sure that the defendant is competent to be in trial and making decisions in the trial about particular strategic decisions? Because the competency question in Schor relates to his decision to waive mitigation. So it's all about Schor's waiver of mitigation. And there's a discussion of the waiver of mitigation. And then there's an argument, I think in a successor habeas, if I remember the facts correctly, I could be wrong about that, where Schor says, okay, even if he waived, not Schor, where Autry says, even if he waived mitigation, there's a question about his competency to do so. So the stretch, I think, that you're suggesting, Judge Elrod, maybe isn't as great as it is because of the nature. They weren't arguing that Schor was incompetent in the way we generally think of incompetency to stand trial. They were talking about, they were trying to make a collateral attack, if you will, on his waiver of mitigation by suggesting that maybe there are competency issues. And the court's... Would we have to ignore Schirro too? I'm sorry? Would we have to ignore Schirro too? No, no. Because again, I think this case is very different than Schirro. Because in Schirro, the defendant told his lawyers from the beginning, I want death. I don't want any mitigation. There's frequent conversations about it. The lawyers did a complete investigation. They told Mr. Schirro all of the mitigation evidence that would be available to him. They made a proffer of it in court. There was a colloquy in the courtroom. It was clear on the record that Schirro was making a knowing and informed waiver of the mitigation for lawyers who had made a competent and adequate investigation. That didn't happen here. And Judge Duncan, if I could go back to Schor for just a second to you. The other thing in Schor is in the end, the court finds that it was reasonable for the state court to find that there was an informed waiver of mitigation in Schor. So the discussion, the more general discussion in Schor is aside to the ultimate finding that there was an informed waiver in Schor. Before we get too far into your time here, I want to talk about Trevino and Martinez, because both of those cases only dealt procedural default. And here, the state claimed that trial counsel was ineffective in failing to investigate and present mitigation evidence. So we have a ruling on the merits from the state court in this habeas proceeding. I don't see any, I don't see that Trevino and Martinez speak specifically, always talks about procedural default. So where does that leave us? Well, in proceeding, here's what happened is in state habeas, the defense raised an issue about counsel's ineffectiveness, but presented no evidence of prejudice. You don't say, you don't argue that state habeas counsel's incompetent. You don't have opinion testimony that they were. You said that we do a very good job. You have no evidence from anybody else saying, yes, that was incompetent. No, we do. We do. That was part of the hearing in front of the magistrate. You don't argue your brief. You just say they did nothing good. Because the magistrate judge didn't reach that question. Well, it seems to me somebody has to. Otherwise, we don't get to the In other words, but you're still missing my point. There was a ruling on the merits in the state court and neither Trevino nor Martinez deal with that situation. They both dealt with procedural default. Robert, what the federal court ruled in one of the prior instances of Valentine v. Davis is that the issue that was presented in federal court, the ineffectiveness claim, complete with evidence of prejudice was a different issue that then had been raised in state court that had not been exhausted and therefore was waived. And that was the original rulings of the federal district court before Martinez and Trevino came out from the U.S. Supreme Court. So, so there is the federal court has found that the issue is waived. It has not been presented or ruled upon. So it's unexhausted. So it's unexhausted. And so it falls within that category. And we haven't addressed state habeas counsel because the magistrate judge's opinion was Martinez-Trevino require a two-part finding. One is ineffectiveness of state habeas counsel. The other is a substantial issue. The magistrate found that was not a substantial issue and therefore didn't reach the other questions. So in our COA, we focused on what the magistrate judge found. Thank you very much. May it please the court. Ballantyne is not entitled to a COA because it's ineffective assistance claim is not substantial. Juris of reason would not debate state habeas counsel's or the denial of 60B relief. Ballantyne preferred the risk of a death sentence over the certainty of life imprisonment. And he instructed his lawyers accordingly. So his own decisions foreclose any claim that trial counsel was objectively ineffective. Really two facts are driving this case. Of course, there's the fact that Ballantyne preferred the death sentence to the life sentence, but also that Ballantyne instructed his lawyers not to call mitigation witnesses to testify at punishment. Where is the best indication in the record of the reason for that instruction? It seems to me there are two plausible arguments. One, that he didn't want to be shipped in the general population, or he would have been told by his counsel that it would be useless to put on the mitigation evidence because there was nothing in there that would encourage the jury to find against the death penalty. So how do we know what was going on at that moment in time in Mr. Ballantyne's mind? Because he didn't tell him that by counsel. Well, I guess the relevant time we're talking about is when the witnesses are subpoenaed, ready, willing to testify. Which is Monday. Which is a Monday. So where in the record best reflects what decision he reached and why? So I think it would be the uncontroverted testimony from his lawyer, Mr. Sherrod, who had said that he was very clear on telling us not to ROA 6729. And it's corroborated, largely corroborated by the investigator, Garrison. I think she talks about this at 7276. But why? Why did he make that? If it's a useful fact, that's one thing. I mean, if that were all in the record, I think you're in a lot different position. Well, I'm talking about the record that we now know more about this from the federal event hearing. Are you talking about just the state record itself, what happened? I'm talking about the entire record. It's still not clear to me what motivated Mr. Ballantyne on that Monday to say don't call any witnesses. Well, I think it's the court below found he did not want a life sentence. And that's the finding that we're talking about here. The magistrate. Right, the magistrate judge. After the event hearing. Correct, correct. What if the reason he didn't want to call the witnesses is he thought it was fruitless? Do you lose? No, we don't lose. And just to step back, whatever the reason may have been, it still happened. There was an instruction to counsel. It was followed. And it prevented us. It prevented the lawyers. It prevented the courts from knowing what the available and ready witnesses were going to say in mitigation. A defendant can't stymie the presentation of evidence and then turn around and claim ineffective assistance. We didn't stymie it until the close of the guilt phase. And so it should have been pretty much in place by then. It's kind of ludicrous, with all due respect, for you to argue here and in your brief that at the end of the guilt phase, the only reason we didn't have a mitigation case because we were stymied by Mr. Ballantyne, that should have been in the can months before. So the fact remains that there were witnesses who were going to testify not just about this residual doubt theory, but the magistrate judge talks about this. At least some of them were going to talk about Mr. Ballantyne's background. This is not a case where there was a complete absence of investigation or factual development. It's more in the line of a case where there are Were they going to talk about his head injuries or any of that? I don't know specifically what they were going to talk about, but nobody does, because there was an instruction not to present it. And I think pretty much But he didn't have that evidence. He didn't have Oh, I'm sorry. I might have misunderstood. I thought you were talking about sort of the witness testimony. I don't think there's an evidence that Any kind of evidence. Was anybody prepared to testify on that Monday or the following day or that week about his head injuries and all that sort of thing? I'm not sure. I know at least one witness, I think his name is Terry Rucker, was well familiar with the defendant's background. But putting that aside, we still had the unrebutted testimony from Mr. Sherrod. It's corroborated by Ms. Garrison that there was this explanation, a very cogent explanation of not wanting a life sentence, preferring the relative safety of death row over the risk of gang reprisals every day in general population. This is not Why isn't that butted by the fact that he wanted his lawyer to cross-examine more vigorously? I think there was, if I recall correctly, there was one witness where at some point, Mr. Valentine had some issue with the cross-examination. I think it was raised briefly and it fell by the wayside. It didn't go anywhere. Why does he care about the cross-examination if the thing is just a formality because he wants death? Why does he care whether his lawyer is rigorous at that point? That's what doesn't make complete sense. Well, I think whatever the objectives of his defense were, it's still not unreasonable to want witnesses who are testifying against you to be truthful. And if you feel like there's something they've said that might What was his criticism specifically? I don't recall the specific criticism, but it didn't go anywhere. You're missing the point, I think. Pardon? You're either missing the point or abating it, which is, as Judge Elrod pointed out, if you want the death sentence, why are you wanting your lawyer to more rigorously cross the people who are urging a death sentence? It doesn't strike me as unreasonable to just want witnesses to testify truthfully in general. Putting that aside, the other suggestion was why would you even argue for life instead of death? Now we know from the evidentiary hearing, this was a lawyer who was opposed to the death penalty, and he felt some moral compunction to make some sort of argument for life. But he wanted to comply with his client's instruction to not present mitigation witnesses. He complied with that instruction and satisfied his own moral obligation that he felt he should at least make an argument. And what he argued was consistent with the evidence. It was a residual doubt theory, but he also asked the jury to consider, if you really do believe Mr. Ballantyne pulled the trigger, was it really an unreasonable choice that he made because Ballantyne had some history with one of the victims? Now, even with all the new evidence that Ballantyne's now relying on, it's all the sort of double-edged evidence this court's repeatedly rejected, and it's not clear that reasonable counsel would have even presented it, because Mr. Sheridan's an experienced lawyer, member of the legal community. He's been a DA. Well, if he testified that, that would be one thing. He said, I've got all this evidence. I looked at it, and I made the decision not to put it on. I discussed it with my client. He agreed. We don't have any of that here. That didn't happen. Well, he had some investigation. Very little. There was enough investigation to... You must concede that by today's standards of police, this is patently ineffective. I'm not ineffective. The deficiency prong raises questions for the deficiency prong. I don't have to speak to that. But as far as whether the entire representation is objectively reasonable, I think it is. But look at the type of mitigation evidence you really would have had to put in front of a jury without risking enraging this jury, that when you've got a defendant who shot three boys, despite every chance to walk away, buying the wrong ammunition, and then going back to the store to get the right ammunition. Standing over the first victim, having the gun jam, and then clearing the jam, coming back and shooting the boy. After shooting the first one, where he had some history with this person, shooting two other boys he didn't even know. The kind of mitigation evidence that was going to suggest a lack of full moral culpability for that is pretty hard to imagine. We're not even talking, though, about ineffective assistance in the first instance in a case like this. Because after all, we're talking about a claim of what state habeas counsel should have done with this claim. And I think as Your Honor raised, there were claims raised in state habeas court about this mitigation investigation. Not the investigation, but the presentation of the witnesses. And claims were raised. There's been no finding that state habeas counsel has been effective on that front. And realistically, state habeas counsel was always going to have a very difficult job making any sort of Wiggins claim in a successful way on a record like this. Because there was an instruction not to present witnesses. No one's going to be able to show the prejudicial effect that more witnesses deprived him of a better mitigation because we don't know what the original witnesses would have said. And you can... So is it just fortuitous, then, that they don't have a lot there? And fortunately for the state, he said that he didn't want these witnesses or else he  would have to go to court. I don't think it's a matter of luck or happenstance. I mean, this was a case where the record that Ballantyne needed to show any chance of having a claim worth pursuing here didn't exist. The magistrate judge gave him every chance and gave this evidentiary hearing. He requested to try to make the record. He rolled the dice, hoping to get favorable evidence, and it didn't come out his way. So you're saying there's no record to be made, basically. It's not that they didn't make a good record, but that there wasn't a record they could have made. Is that what you're saying now? Basically, right. We know that Mr. Bertsong, the state habeas counsel, sat down with Ballantyne in jail and talked about why did you reject the life sentence. And they talked about his background. He didn't come away from that conversation thinking there was anything worth pursuing. And we have to assume that the conversation... What was his response to Mr. Bertsong? He didn't recall the specifics. That doesn't tell us anything. But Ballantyne can't argue from the absence of evidence that there's a debatable point there. It's exactly... I think we have to assume that when those conversations happen, and we know that there is an unrebutted conversation where Ballantyne is explaining his reasons for preferring a sentence to life sentence, you can't fault state habeas counsel for looking at that and saying, at best, I have a very weak Wiggins claim I could present. He did present a claim to the state habeas court that it was ineffective. If Ballantyne... This isn't him. It's just that Bertsong doesn't talk to him. He doesn't say, I'm happy on death row. Don't try to get me off. He encourages state habeas counsel to go forward and get a new penalty phase trial. No. That's not consistent with him wanting a death sentence as opposed to a life sentence. Well, I don't think we have to reach that question exactly. We have to look at what he should have done with this new Wiggins claim. And what he, I guess, chose was, I'm going to argue that the failure to present whatever mitigation witnesses you have, this was claim 20, you should have at least tried it because I think his phrase was, what's the worst that could have happened? If you can't convince the state habeas court that it was objectively unreasonable not to present mitigation evidence, you're not going to be able to show a court that investigated more... I think there are those best practices, things counsel might do now, but there's also the... Well, I believe so. But what I'm referring to is when counsel is going to make some limitations on what they're going to look into strategically, what are they going to look into and spend their time on pursuing. If counsel is sitting down, has a conversation, and it goes exactly like the unrebutted testimony has been... State habeas counsel. I mean, I think... What's state habeas counsel's excuse for not doing the full on mitigation investigation? It would have led nowhere. How do you know that? Is that what... Is there evidence in the record? Because when Lydia Brandt did the investigation, she found a lot of information. Information that is double-edged, that's far from clear, reasonable... The Supreme Court has reversed us on many times for saying you should go to the end. I'm not aware of any case from the Supreme Court reversing in a posture like this, where there is an instruction not to... That's in the instruction. We're just talking about the quality. You said mitigation evidence is worthless. The Supreme Court has clearly said it's not. Well, I'm not arguing that mitigation evidence is worthless. Yes, you are. You're saying there's nothing to find. And you're saying what Lydia Brandt found was worthless, and I don't think that's right. So on this record, though, where it was not going to be fruitful for state habeas counsel to say... Why do we not have a note? So we know because the state habeas court said it was objectively reasonable not to present the witnesses that were available. So I think it's been sure doubt that Autry, Mastad, Schriero, when there's a lack of a record of what available witnesses would have said, you cannot make an IAC claim based on an investigation of more evidence. It's academic. Well, I didn't think that Mr. Sherrod's testimony about I don't want the death penalty, I want the death penalty as opposed to life, I thought that didn't even come out until after the state habeas proceeding was over. So it didn't. But here's what we would have known just from looking at the state record itself. We would have known that there was an inadequate investigation and that why didn't state habeas counsel perform a better investigation? Because he was still going to have an impossible time showing prejudice. And that's on record. Well, I say this for two reasons. The record I'm referring to from state court that would have raised that problem for state offering this life offer before the defense has put on one word of testimony in a case where the defendant has confessed and has zero realistic chance of acquittal and the defendant rejects the life offer. And we also know just looking at the state record that something like half a dozen witnesses are subpoenaed and ready and willing to testify up to the date of punishment. They're ready to go. So he has to assume that there has been some investigation. And what he's left with is a claim of a matter of degree, should have done more investigation. But those claims are routinely rejected by courts. Like in Dauta, in Cardi, those claims don't fare very well because it can always say that the lawyer should have done more, should have developed more. So it's at best a very weak claim. And we expect state habeas counsel, if they're effective, to winnow out those weaker claims and press claims that are worth pursuing. But it's not objectively unreasonable to forego those claims and also not objectively unreasonable not to make more of an investigation into facts that might support a claim that's ultimately not going to fail. At the time, when is the habeas counsel speaking to Mr. Valentine about what to pursue? I understand we don't have a record of what was said, but when was that happening? 19, in the late 90s? I don't recall. So at that time, we don't know anything really about Mr. Valentine's motivations, about what he instructed counsel to do. We don't know anything about that. But now we have an evidentiary hearing in front of the Federal Magistrate that makes fact findings as to what he told counsel and what his motivations were. Is that right? I'm not sure. Well, we understand now from the magistrates, having had an evidentiary hearing, what he instructed counsel and what his motivations were. Right. Right. Now, how does that factor into our decision here, whether to grant a COA on the denial of 60 v. 6? So it... Does that make weight at all? Or should I just ignore the magistrate's findings? I think that hearing had... The findings have only created additional reasons why the claim would fail, why the COA would be denied. Is there a denial in any weight at all, the magistrate's findings? On the COA question alone? Yes. I'm not entirely sure of the answer to that, because I would think that... The magistrate had an evidentiary hearing. Maybe I'm misunderstanding you. That would not have a difference. I think it... How can we defer to it as a fact finding? I mean, can I just ignore it and say, no, no, he might have had other motivations. He might have told counsel something different. Well, he can't do that. What you're left with is a record that you start with a deference to it. And I've heard nothing suggested it would overcome that somehow. So I think the answer is yes. But the magistrate on the basis of those findings denied a rule 60 v. 6 motion to reopen, right? Right. And we're here on a motion for COA to at least allow an appeal from that, right? Right. And what's the standard that we would have to find in order to grant a COA? So it would have to be debatable among jurists of reason, but based on... Or encouragement by the current... Right. But the deference, the standard... I thought we'd have to find it debatable whether the district court was correct in this procedural ruling. That is a requirement as well. Yes, the constitutional... How is it debatable? Don't we have to consider the fact findings made after an evidentiary hearing to figure out whether it's debatable that the ruling was incorrect? Right. I think I understand. Yes, you do. Okay. Yes. Yes, Your Honor. So there's no ambiguity on this? No, I think I'm listening to you. We have to decide not to defer to the fact findings, that we have to find that there's some reason not to defer or to move forward at all. I think that's right. Yes. And so... I'm not going to use the term deference. I understand that this isn't, for that respect, in that respect, this isn't an epideference case. Mr. Lev pointed out that this is not a case like Shore where there was a state finding that we have to defer to under D2. Not epideference, but... Right, but a different... There must be not reasonable decision on this 60 v. 6. But did it abuse its discretion? So there is, I guess, an abuse of discretion component in some procedural rulings, but here there's that underlying fact determination, which has that higher, clearly erroneous standard. I just thought if the defendant instructed counsel not to put on mitigating evidence, there couldn't be an IAC problem. That is correct. Based on the failure to put on mitigating evidence. I thought that's what we said in Shore. I agree with that. That is correct. There's a suggestion that somehow Shore is not controlling, but... Well, there were distinctions made. Distinctions, yes. Shore was a D2 case because there was a state finding, right? Here there wasn't a state finding on what he told, what Valentine told counsel, right? Right. So that's why the Magistrate presumably had an evidentiary hearing on that point. Right. But what we're left with is a factual finding as to what he told counsel. So that happened. There's a record of that now, and that forecloses this IAC claim under Shore. But also the precedent that Shore is itself based on. I'm not aware of any case from this Court or Supreme Court precedent that would allow these types of instructions to be given to counsel and let the defendant turn around and bring an IAC claim based on a failure to investigate. It's just never happened. Okay. But do we all agree that the first thing that we need to do is to decide on the 60D6 if there is an abuse of discretion. Whether a reasonable jurist can conclude that the District Court abused his discretion in declining to reopen the judgment. That's our first, our pathway to deciding the case. That's the first question we ask. Right. Is that correct? I think that's the first question, yes. Yes. So, but the subsidiary questions, once you start unpacking that, boil down to a pretty insurmountable barrier to a claim like this, which is you've got a finding where there's this instruction, and it's going to foreclose an IAC claim. There are no further questions. I ask the Court to affirm the denial of the COA. Let me try to make a few points in the little bit of time I have left. First of all, I want this Court to understand that Mr. Ballantyne cooperated with counsel throughout all the pretrial and trial proceedings in this case. When Ms. Garrison was finally appointed and spoke with Mr. Ballantyne in terms of mitigation just prior to the start of trial, much too late, of course, Mr. Ballantyne cooperated with her. He gave her names of potential witnesses, of family members. He signed releases so that she could get records. He showed no opposition and no desire for the death penalty, or no opposition to a life sentence at that point. It wasn't until the plea offer was made at the end of trial, it was the very first time in any way that there's any indication that Mr. Ballantyne showed any question about life or death. And as I tried to say earlier, that's in the context of the plea negotiation. And it can't be separated from the deficient performance that led counsel to that position, where the only witnesses counsel had. And at ROA 6730, Mr. Sherrod says, all we had, potential witnesses, that the threats were made against him. That's all he was aware of. So Ballantyne's making acquiescent to counsel's instructions because that's all counsel gave him to choose from. It's counsel's deficient performance that put Ballantyne in that position, where his choice was to call witnesses who wouldn't help him, or not call witnesses who wouldn't help him, and reach the same result anyway. I wanted to respond, Judge Elrod, about the abusive discretion standard. And yes, abusive discretion is the normal standard in the denial of the 60B. I'm not sure that's appropriate here because the magistrate judge here didn't really exercise his discretion. He didn't go through the multi-factor test of seven L's to reach a 60B decision. He rested his decision solely upon his legal finding. Is that required under 60B-6 under our cases? I believe that is required, ultimately. I thought in a case called Lady, that it said, this court has never explicitly held that the seven L's factors bear on the extraordinary circumstances of Grander 60B. That may be correct. I'm not sure I know that. So therefore, it couldn't be error. It might not be error. But I think in terms of your review, the magistrate judge's opinion, because this case is so nested, we have the ineffectiveness claim within the next of the Martinez claim within the nest of the 60B. We never really get to the extraordinary circumstances 60B question because the magistrate judge relied solely on his legal ruling that the ineffectiveness of trial counsel claim had no merit. I think that by the discussion we've had today, I think we've shown that these issues are reasonably debatable and that we've met, at the very least, whether we meet the merits eventually or not, at the very least, we've met the COA standard today. I thank the court very, very much for the opportunity to speak to you. Counsel, that will conclude the arguments. This case is at your submission. Thank you. All rise.